And then next up is 21-1058 United States America v. Ullah Ms. Cassidy, when you're ready. Good morning, Your Honors. May it please the Court. Mr. Ullah challenges on this appeal three of the six counts of his conviction, counts one, five, and six. I will first address count five, the attack on a mass transportation system, because this presents three distinct legal errors. For count five, the government charged two alternative theories, or the Court charged two alternative theories to the jury. One was that Ullah placed a destructive device in, upon, or near a mass transportation vehicle within the meaning of 1992A2. And the second was that he committed an act with the intent to cause death or serious bodily injury to a person in a terminal or structure used in the operation of a mass transportation vehicle under 1992A7. The aggravating element of 1992B, which increased the maximum sentence from 20 years to life for committing the offense in a circumstance in which the mass transportation vehicle was carrying a passenger, was charged with respect to both theories. The conviction cannot stand under the placement theory for two independent reasons. First, the Court constructively amended the indictment when it charged a completely different act as the placement of the device on a subway car from the act charged in the indictment. And two, the new theory did not constitute placement of the device under the plain text of the statute. I'm sorry, can I ask a question? Is this a question of statutory interpretation or rather one of fact, given what the bomb in question was, whether or not he'd actually placed it? Well, it's a question of whether these facts can fit the statutory language, whether the statute applies to the fact that the judge charged. But it's a specific type of bomb, right? And so at that point, does it become a fact question, whether or not it was placed? I mean, there's no definition of what placement means. The judge actually held that it was a legal question. And it wouldn't even charge it to the jury as a factual question. I'm asking, I'm not sure that it's a legal question. So do you have an opinion on that? Well, the question of what the statute means is a legal question. So our argument is that the plain terms of the statute don't apply to carrying or transporting. That what was charged as placement was actually carrying or transporting, and that the statute itself prohibits only placement, not placing, carrying, or transporting. So under your idea, the idea of a bomb strapped to you can never fall under this because that is merely carrying, it's not placing? I mean, there's something unique about what this type of bomb is. And that's what I'm trying to square those. Right. Well, it's possible that this act never fell within, would not have fallen within the placement theory, even under the government's original theory as charged, which was that it was, but the theory as charged in the indictment was that the bomb was placed when it was detonated. Because before that, it was simply carried or transported. When it was, it was never taken off and placed, obviously, because it was a suicide bomb. But when it was, the theory was, as charged in the indictment, was that it was placed when it was detonated. That that was placed, and that was the last place, that was the place where it was finally put when it was detonated. So the problem with the way it was charged to the jury was that that original, one, that original theory, the actual act that was charged in the indictment, it was placed when detonated in the Port Authority, was not the theory charged. The court instead charged a completely different theory, which was that it was placed on the subway when Ullah carried it on the subway, boarded the subway, wearing it, unconnected. It was disconnected. The two parts that need to be connected were separate, and it wasn't ready to go. Well, how could you ever have placement without carrying? It doesn't appear from the heavens. In order to have a placement, you have to have a carry. Yes, but those are two separate acts. The placing. What I'm saying is that placement implies getting it to place, getting it, which means carrying or transporting. But this was not charged as a continuing course of conduct. The only act, if we're speaking about constructive amendment, or if we're speaking about the constructive amendment, the only act that was charged, there was not even a mention of him riding the subway with this on him, or anything other than the detonation of the device in the Port Authority. That was the act that was charged for every one of the counts that were charged, including the placement. And under the case law, this is a classic constructive amendment. Everybody was surprised by this change. This first came up at the end of the case, when basically the judge was going to direct a verdict on the placement theory. There were two theories for this statutory offense, and the judge was going to direct a verdict on subsection A2 because, as it turned out, when all the evidence was in, it showed that the bomb was detonated nowhere near a subway car. And the requirement of section A2 was that it be placed, in this case the act was detonation, in, upon, or near a subway car, and it was nowhere near a subway car. So at that point, the government changed its theory, and everybody was surprised. There was a lot of talk about the switch, and this was new, and nobody knew this. Were there objections made by defense counsel? Yes, it was briefed, it was argued, there was a lot of litigation on this issue. And if we look at the case law, the two cases that are instructive, I think, are Milstein and D'Amelio, in determining whether this is a constructive amendment. The government argues, first of all, that as long as they charge the statutory language, there can be no constructive amendment, and basically it doesn't matter what the facts were charged in the indictment. But that is definitely not the law. First of all, all the cases on constructive amendment all involve a change in the facts, not the statutory language, which is fixed. It's always, the case is always about what is the act that was charged, and was the core criminal act changed, or was it just an ancillary fact? So if you look at Milstein, the indictment in that case alleged misbranding of pharmaceuticals. The change in theory from selling, first of all, the indictment alleged misbranding, putting the wrong label on, and at trial, the government changed its theory to selling unsterile drugs, and therefore those were misbranded, which was not the act alleged in the indictment. That was held by this court to be a constructive amendment. In D'Amelio, on the other hand, the core of crime, the core criminal conduct was enticement of a minor, and so the court allowed the addition of phone calls in addition to the use of the Internet, which was the kind of ancillary use of interstate commerce. The courts held that that was not a constructive amendment. So in this case, the core criminal act, which was the detonation of the bomb, was changed at trial to a much earlier carrying of the unconnected bomb on the subway. That, we contend, was a constructive amendment, and it never should have been submitted to the jury. Second, the theory is not supported by the text. Placement, under the dictionary definition of placing means to put in a place or in an order. Carrying and transporting, on the other hand, mean different things, and those acts, those carrying and transporting of a gun, a destructive device, a substance, has been specifically prescribed by Congress. So is it separate statute for carrying and transporting? Yes, in fact, 924C. So you're arguing that the prosecution made a mistake in charging placing and not carrying and transporting? Well, it did charge carrying and transporting under 924C, which is another count in the case. So they did? They did, but what we're arguing is that this count cannot stand. 1992 sub A cannot, A2 cannot stand. So, now, we do not contest the conviction under subsection A7, which was the alternative section, that prescribes any act including the use of a dangerous weapon with intent to cause death or serious bodily injury to any person who is in a garage terminal structure or facility. However, we do contest the aggravating element under subsection B that raised the sentence from 20 years to life because it doesn't apply by its terms to subsection A7. So this is a sentencing issue now? Well, it's a sentence based on an aggravating element of the statute. So it raised the maximum from 20 years to life, and Mr. Ulla received a life sentence for that count. Didn't he receive a life sentence for other counts as well? He did. If we'd agree with you that placing is not carrying and transporting, it would not change his sentence at all. Well, it would change his sentence if you also agree with me that subsection B does not apply to a crime, any act under A7 that would reduce his sentence from life to 20 years on that count. And so if there's a change in the overall package, it would need to be resentenced. There would need to be a resentencing. So I can explain why subsection B doesn't apply, or I could move on to 924C. Well, you do have two minutes left. Okay. So I'd like to reserve a rebuttal. Would you like some of that time now? No, I think no. I'll keep my rebuttal. So the 924C count, which added 30 years to his sentence, life plus 30 years, cannot stand. The district court ruled that the offense of conviction in count three qualifies as a crime of violence within the median of 924C. It does not. The offense in section 2332FA prescribes delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use with the intent to cause death and serious physical injury or to cause extensive destruction. The minimum conduct- Life plus 30 years makes the government look silly. Life plus 30? Yeah. Well, exactly, Your Honor. Life plus 30 was excessive. And I have a sentencing argument, which I'd like to touch on very briefly soon, too. But basically for the 924C count, for three or five, the minimum conduct required to commit count three does not require the use of force against the person or property of another. It can be any person, including the defendant himself, which is what happened here. He tried to kill himself. The recent Supreme Court case of Borden emphasized how crucial the language against another is, that it has to be use of force against the person or property of another. And both under count three and count five, both of those crimes could be committed by an act against the person himself, a perpetrator trying to hurt, seriously injure, or kill himself. Now, if there are no questions on that, I'd just like to address this. Well, we have kept you longer, so we'll- You'll be- You've got your rebuttal. Okay. So the government's basic argument- We've kept you well over time. We'll hear from you during your rebuttal. Oh, okay. Oh, I thought you said I could go on. Okay. Thank you. Okay. Thank you. May I please the court? My name is George Turner. I'm an assistant U.S. attorney in the Southern District of New York. How do you propose to enforce life plus 30 years? Your Honor, it is effectively a life sentence. The 30 years comes from the mandatory consecutive term. I understand, but who's going to enforce it? Well, Your Honor, as a practical matter, it is a life sentence, and that will be enforced. Thank you. Do you mind spending a good chunk of your time on the material support, the services part? Yes. Let me ask you a question about that. So the erstwhile district court said that, quote, And if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of services in the statute. But the Supreme Court in the HLP case seems to require either coordination or direction. And I'm wondering whether invitation is inconsistent with that. It's not, Your Honor. And just to step back for a moment, a lot of briefing has been devoted to subsection H of the material support statute, 2339B. Subsection H defines personnel. Service is a separate prong, a separate form of material support that can be provided. And what the Supreme Court found in the HLP case is that the service cannot be entirely independent from the group. You can't have an actor who acts entirely independent from a group provide a service. They focused on the word to. The service has to be provided to the group. Therefore, there has to be a nexus, a link between the individual, the actor, and the group. And then it pivoted, and it went to define service because service is not defined in the statute. And the definition that the court articulated included an act that is commanded by or performed for the benefit of another. So the framework that we're operating in is the action cannot be entirely independent, and it has to be either commanded by or performed for the benefit of another. The instruction that Judge Sullivan gave, and it was entirely reasonable for him to put some meat on the bone of that term in the statute, required the jury to find the requisite link between the action and the group. And that is what happened here. You actually had a service that was provided in direct response to an instruction given by the group through propaganda and through a particular video that the defendant accessed, watched, and acted in response to. So it was a service in that sense. So what do you make of the fact that the language in HLP, while it includes what you just said, also further defines the conditions for conviction on the service provision to services provided, quote, in coordination with or at the direction of the terrorist organization? Isn't that what the Supreme Court said? Supreme Court said, Your Honor, and this is 561 U.S. 22, service refers to concerted activity, not independent advocacy. So they're ruling out the entirely independent activity. And then it goes on to give the dictionary definition that includes an act done for the benefit or at the command of another. But, Your Honor, going more directly to the phrasing that Your Honor is getting at, this was concerted activity. This was in coordination with the group. There was expert testimony, extensive expert testimony that ISIS functions specifically through this means. It communicates with its followers in the West, in the United States and elsewhere, through these propaganda messages that its followers access, consume, and act upon. And what you had here is ISIS communicating with the defendant in this case through its propaganda where it directed explicitly you as a follower must go carry out an attack or travel and join us. And the defendant in this case acted in response to that direction. What the defendant has continued to do in the briefing is confuse the concept of entirely independent with some requirement that is nowhere in the statute, in the case law, or in common sense, that there has to be some one-to-one phone call or text message between a terrorist operative and the group. The terrorist group can communicate and coordinate and engage in concerted activity with its followers in any number of means. What about the statutory language? Isn't the statutory language? Maybe I'm misremembering. The statutory language is that it prohibits services performed in coordination with or the direction of a foreign terrorist organization, yes? That's actually not quite correct, Your Honor. Okay. The statute requires that material support be provided to the foreign terrorist organization. The gloss of direction or control, that comes through subsection H of the statute. There is no similar statutory language defining the term service. And that's why the Supreme Court gave you two rubrics, two frameworks. One, the service cannot be entirely independent. And two, here's a definition, a common sense dictionary definition. Act performed to benefit another, at the command of another, concerted activity. And that essentially requires the requisite link or nexus between the actor and the group. And here you had both. You had activity that was not independent. He radicalized. He consumed propaganda. He acted in response to a direction from the group. He proclaimed afterwards that it was on behalf of the group. And this is, in fact, exactly how the terrorist group operated. And I will add one point on the legislative history here, Your Honor. There has been an assertion that Congress, in substance, in some of the briefing, that Congress legislated out lone wolf attacks through some of the language that's in subsection H of the material support statute. That is wrong. The subsection H was added to the material support statute in 2004. And it was done in direct response to the ongoing litigation in the HLP case, which is a case that is completely different from this case, where you had groups looking to engage in independent advocacy on behalf of some of these groups. The Ninth Circuit had found that the term personnel was impermissibly vague. And so Congress amended the statute and said, okay, here is subsection H. Personnel means acting at the direction or control of the group, and it can't be entirely independent. In the same act, it added the term service to the statute. So completely different from subsection H, which defined personnel. And at no point in that process were lone wolf attacks on the mind of Congress. It was in response to the HLP case. So the idea that somehow these provisions legislated out a core service for terrorist groups, which is committing a terrorist attack to advance the group's objectives at the group's instruction, there's no support for that. And so what you had here is you had a defendant who was attempting to act and was acting at the direction of the group. It was not entirely independent. That's personnel. And he provided a quintessential service. And the expert testimony supported this as well by acting not independently but in response to an instruction concerted activity with the group. So you have material support on both prongs. Well, I'll let you go on this issue because I know there are other issues you want to address. But just one last question. Where do you find in either HLP or in the statute the word invitation? Invitation is not in the statute. And that was among the phrases that Judge Sullivan used, and we submit that when read. If I recall correctly, the government didn't even ask him to use that in their request to charge. I may be wrong about that, but that's my recollection. Judge Sullivan, in response to the short answer to your question is you're correct, Your Honor. Judge Sullivan came up with that language himself, and that was in response to both parties recognizing that service is not defined in the statute. And therefore, he incorporated, he did incorporate explicitly into the instruction the language, some of the language from the HLP case about an act being commanded by or performed for the benefit of another. And that was the case that the defendant was relying on below. He incorporated that language. He provided some additional color as to what this required nexus or link could be. And we submit it was entirely appropriate. I actually had an overarching question on this issue. So we all know that the Supreme Court said that the Humanitarian Law Project said that advocacy could constitute material support as long as it's done under the direction or in coordination with an FDO. So it's having direction and coordination do a lot of work to prevent abuse or overreaching of that. But in this case, we had the district court say that acting on broadcast propaganda is to act under the direction. So if we were to take the district court's idea that acting under the direction could include something like a broadcast and then put that with the Humanitarian Law Project finding that advocacy alone could be constituting material support, is there a way that we can put those two together without getting in a position where we are criminalizing people engaging in political advocacy on the basis of broadcasts? Yes, Your Honor. You can put them together. And I will note at the outset what is an obvious point but is an important one, that this case had nothing to do with advocacy. No, I know. I know. I know. But you're asking us to make law here. So I want to make sure that we've got a workable principle. So on the first hypothetical Your Honor raised, it goes to historically some of the cases. For example, if you have a group like Al-Qaeda that is directing its operatives to go out and promote the message, for example, you might have a spokesperson for the group who is going out and engaging in advocacy, recruiting, inspiring, et cetera. That's material support, acting at the direction of the group. Right. And so direction control is doing a lot of work to prevent abuse or overreach. That's right. And I think then, moving to your sort of second hypothetical and getting closer to this case, it's a spectrum and it's a fact question. So you could have a very different case where perhaps the propaganda, that is that issue, is less explicit, less direct, not providing instructions, and there's no direct link between the propaganda and the act that has been provided as material support. For example, take someone who watches one. How about, like, let's say the PKK, an organization, a deemed terrorist organization, is putting out videos of truthful, accurate representations of things that happened to Kurds. Right. And then somebody else has a rally, not because they support any of the other stuff or that they intended to provide material support, but this was an area in which the advocacy aligned with a goal of a terrorist organization. Like, under your posture or under the proposition of law you're asking us to endorse, would we be obligated to hold that person liable for violating this? Your Honor, I think you're identifying a scenario that is much closer to the concern raised in HLP, where you have someone who's going out and engaging in independent advocacy. For example, if someone watches propaganda, likes what they see, oh, that group makes sense, and then with no instruction or direction from the group goes out and holds a rally in Central Park and says you should go support PKK or ISIS, you're getting closer to independent advocacy that would not fall within the bounds of the statute. And you're saying the reason that this is not a problem in this case is because the mode by which this particular organization recruits people is this method. Is that right? Two things. One, mostly that and that this group, the way this group functioned, the way that support was provided by its followers to the group was in response to the commands and directions provided through this type of medium. But second, and very importantly, the hypotheticals that we're talking about are not this case. And as a factual matter, in this case you had a one specific video, Flames of War II, it's in the record, a week before the attack that specifically said, you, ISIS followers, carry out attacks in the homeland. The defendant said after the attack, that was his motivating factor. He was responding to that direction, that call from the group. He took the slogan that was in that video, Die in Your Rage, America, and he posted it all over his apartment for people to find. So what you have in this case is not just a general propaganda and someone engaging in advocacy, you had an actual instruction conveyed through a specific video to a follower who acted on it. And so, respectfully, you're getting at, of course, the core of the issue in terms of some other cases where you might run into trouble with that HLP problem. That's not this case. It was a very explicit instruction that was received and acted upon by the defendant. Anybody else have any other questions? We've kept you over. Okay, thank you so much. We appreciate it. Ms. Cassidy, you have two minutes. Just a quick factual and then get to the legal part. Flames of War came out, as my adversary said, the week before. Mr. Ulla started building his bomb. It was built over a period of 20 days, according to their own evidence. So he wasn't responding to any directions or specific direction in that video. What he was doing, and he didn't say he followed the directions. He only said that he saw it. That's it. He saw videos, propaganda that was directed at the public. He was, as a member of the public, acted inspired by those videos. If he had the intent to build the bomb before he saw that particular video, that particular video still could have been the motivating force that drove him to the subway. But even if it was, that doesn't constitute direction and control. So just getting back to Holder, in response to Judge Rakoff's question, no, it does not use the word invitation. It neither does it use the word nexus, which is the word the government has used throughout its briefing. That's all you need is a nexus. That is not all you need. You need in coordination with or under the control. And that's according to Holder. And Holder explicitly says that this bar, this prohibition in subsection H, which is not a gloss on the statute, is an express prohibition. This shall not be prosecuted under this statute. Although it refers to personnel, the Supreme Court held in Holder, that it equally applies to services. Because if Congress, as the government points out, Congress put services in at the same time as it introduced this bar, it would not have allowed under service what it just barred under personnel. So clearly, this kind of act, a member of the public listening to propaganda, having absolutely no communication with anyone in ISIS, does not constitute direction or control. The dictionary of, certainly control, we know what that means. The dictionary definition of direction is guidance or supervision of action or conduct. And you have to read these terms together. Direction doesn't just mean an invitation or an idea. It means control supervision. And Judge Sullivan not only allowed the jury to find this, to convict of this crime under the invitation theory, the judge actually directed a verdict. The judge told the jury, if you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct, and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient. Now, if I could just touch on the sentencing issue. We're good. We're okay. Thank you so much. We've kept you longer than we're supposed to. Okay. Thank you. So this concludes arguments on all of our cases for the calendar today. We have one case on submission. That's Rafi versus Yale School of Medicine. That's 21-268. I want to thank all of the oralists. I want to thank the court security officers for keeping us safe. I hope you will thank them on your way out. And we are done and adjourned for today. Thank you, Your Honor. Court stands adjourned.